# TABLE OF CONTENTS OF APPENDIX

Order on Cross-Motions for Summary Judgment [Doc. 38],
September 27, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-001

Judgment [Doc. 39], September 27, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . A-008

Order [Doc. 44], June 5, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-009

Article XXXIV of the collective bargaining agreement . . . . . . . . . . . . . . . . . A-012

Opinion and Award of Arbitrator Donald J. Petersen,
November 8, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-013

Case: 1:02306-HAB-DGB Document: 80   Page Filed: 09/13/2013   Pages: 25

E-FILED
Thursday, 27 September, 2012  03:34:23 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STEEL, PAPER AND FORESTRY, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC and LOCAL UNION 193-G, | ) ) ) ) ) ) | 09-2306 |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| PPG INDUSTRIES, INC., | ) ) | |
| Defendant. | ) ) ) | |

### ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

On December 16, 2009, the plaintiffs, United Steel, Paper and Forestry, Manufacturing, Energy, Allied Industrial and Service Workers International Union, ALF-CIO, CLC ("United Steelworkers"), and Local Union 193-G (collectively, the "Union"), commenced this action against PPG Industries, Inc. ("PPG"), to enforce an arbitration award pertaining to a collective bargaining agreement between the parties. The parties filed cross-motions for summary judgment [20, 21]. At various points the parties have requested a stay of proceedings to pursue settlement discussions. *See* d/e 33, d/e 36. In a recently filed joint status report [37], the parties informed the court that the latest attempts to settle the case were unsuccessful, and asked the court to proceed with a ruling on the pending motions.

### FACTS

The Union represents a bargaining unit of production and maintenance employees at PPG's facility in Mt. Zion, Illinois, for the purpose of collective bargaining. In 2002, the Union and PPG entered into a collective bargaining agreement (the "Agreement") effective until June 15, 2008. On June 13, 2008, the Union and PPG agreed to extend the Agreement. The parties dispute the length of the extension, but do not dispute that the term set forth in writing in the extension was one year, to June 2009. At that time, PPG had competition in the flat glass field, and its labor costs were $10 per hour higher than the competition. In April 2009, PPG notified the Union of its desire to modify the Agreement.

Section 2 of Article XXXIV ("Section 2") sets forth a timetable for discontinuing or modifying the Agreement:

> Should either party desire to discontinue or modify the existing agreement upon any termination date, at least thirty (30) days prior written notice of such intent must be given to the other party hereto. In the event of notice of cancellation or modification

1

of the agreements, it shall be the duty of the parties to meet in conference not less than (10) days prior to the expiration date of said agreement for the purpose of negotiating new or modified agreements.

It is further agreed that proposed changes or new agreements shall be presented not later than the first day of the conference by the party serving notice.

A.

Pursuant to PPG's notice, the Union's representative met briefly on May 14, 2009, in Chicago, Illinois, with PPG's representatives. In that meeting, PPG's representative discussed its labor costs of $37 per hour at the Mt. Zion facility compared to its competitors' labor costs of $22 to $26 per hour. PPG informed the Union that for the Mt. Zion plant to remain viable, PPG intended to introduce a two-tiered wage system, with a target labor cost of $27 per hour,[1] during the upcoming negotiations. PPG had negotiated a similar deal at its Fresno, California plant.[2] The Union representative asked if PPG could reach its $27 target without requiring wage concessions. The PPG representative stated that he was indifferent as to the means to achieve the stated goal, but did not think the Fresno pattern would be enough to attain PPG's cost goals in Mt. Zion. The Union representative asked for a copy of the Fresno settlement and requested that PPG provide "blended" labor costs for the proposed two-tiered wage system.

On May 28, 2009, PPG emailed the requested information to the Union. In the email, PPG explained that its calculation came to a blended labor rate of $30.21 based on the assumption of a "fully populated bottom tier/complement of the equivalent of supplemental workers." The email stated, in pertinent part, "At our Chicago meeting I said that PPG wants the blended Cost Per Labor Hour below $27 by the end of a three year agreement. So, in PPG's view, we have a $3.21 blended CPLH bogey over and above what we get with the bottom tier of jobs fully populated. We can save more money by more Tier 1 folks leaving and being replaced at Tier II rates for the higher skill jobs. That would certainly be the best scenario. However, I really think it will be difficult to get to the $27 without significant concessions from current employees."[3] See d/e 20-8, p.2.

---

[1] A reduction in general operating costs was not the focus; the discussion focused on reducing labor costs.

[2] The arbitrator noted that United Steelworkers also represented the bargaining unit at the Fresno plant, and "the Fresno negotiations had become historically a pattern for the Mt. Zion plant to follow. Local Union and Company representatives attended these negotiations." See d/e 20-4, p.3 n.1, p.4 n.3.

[3] The clear import of a blended cost per labor hour of $3.21 over the target, with a two-tiered system and the bottom tier fully populated, necessarily means that further economic concessions would have to come from the top tier, i.e., active employees.

2

A-002

B.

Contract negotiations began on June 1, 2009. On the first day of the negotiating conference, PPG made an opening statement[4] and then presented a series of bargaining proposals on non-economic topics such as the duration of the agreement, a drug testing policy, and seniority. On June 2, the Union accepted the non-economic proposals but when PPG presented economic proposals the Union stated that it was not obligated to bargain over any proposals that PPG had not presented by the end of the previous day. PPG disagreed, and on June 2 and 3, PPG presented its bargaining proposals on specific wage rates (reductions) for active employees, recalled employees and new hires, and proposals on health care benefits, pensions, vacation pay, funeral pay and jury pay, among other subjects. Dollar amounts were presented on the two-tiered wage rate proposal, with wage cuts for both Tier 1 and Tier 2 employees. No agreement was reached.

On July 1, 2009, PPG and the Union signed a memorandum of agreement extending all terms and conditions of the Agreement indefinitely while they continued to negotiate a new contract. The extension could be terminated by either PPG or the Union with a thirty-day written notice.

C.

The Union timely invoked the grievance procedure to challenge PPG's untimely attempt to propose modifications to the parties' collective bargaining agreement. The four-step grievance process was unsuccessful, and the Union certified the grievance to arbitration. The stipulated issue was: "Did [PPG] violate . . . Section 2? If so, what should be the remedy?"

An arbitration hearing was held on October 14, 2009. On November 8, 2009, the arbitrator issued his Opinion and Award.

In his Opinion, the arbitrator outlined the parties' respective positions. Stated simply, the Union argued that PPG's idea of a two-tiered pay system presented at the Chicago meeting, its May 28 email, and its opening statement[5] on June 1 were insufficient under Section 2 because

---

[4] The opening statement included the following: "The more people that we can hire at second tier rates, the better . . . but it will still be impossible to get to [the $10 reduction] without wage adjustments from current employees. . . . This whole situation is very unfortunate and will be very difficult for us to work through. However, if we are successful we can accomplish the following: Reduce the level of wage adjustments that will be necessary from current employees . . ." Def. Ex. 6B, Co. Ex. 2.

[5] PPG 's opening statement "stressed the flat glass market was depressed; that [PPG's] competitive advantages had eroded, and that [PPG] needed to get labor costs down to $27. [It] also stressed the need for [PPG] to obtain a two-tier wage system." The arbitrator noted that the "system contemplates tier one as the higher wages for current employees and tier two, the lower

3

PPG made no "specific proposed modifications" by the first day of the conference (June 1). The Company argued that Section 2 required only that proposed changes or new agreements be presented not later than June 1, and it met this requirement when PPG presented its plans to the Union at the Chicago meeting on May 14, and followed up with more specific information by email on May 28.

The arbitrator agreed with PPG that the phrase in Section 2 that "proposed changes or new agreements shall be presented not later than the first day of the conference by the party serving notice" does not prohibit proposed changes or new agreements from being presented *prior to* the first day of the conference. PPG indicated two weeks prior to the first day of the conference that it would seek a $10 reduction in labor costs and a two-tier wage structure, and that the Fresno arrangement would not be enough. PPG followed up several days prior to conference with an email showing a blended two-tiered cost per labor hour.

The Opinion notes that arbitrators "exist to enforce the provisions of the collective bargaining agreement as they exist." *See* d/e 20-4, p.11. The arbitrator could not rewrite the Agreement by requiring that proposals be specific and/or written. "The Union knew or should have know[n] some of [PPG's] economic proposals" and that PPG "preserved these proposals on the basis that . . . Section 2 permits . . . discussion of proposals prior to the first day of the conference." *See* d/e 20-4, p.11. The Opinion further states, "Those proposals introduced on June 2nd and June 3rd are discretionary items which the Union is free to bargain over or not." The three-sentence Award stated:

> [PPG's] proposal regarding $10 reduction in costs is a viable contract proposal as is the two-tiered system. Also, [PPG's] non-economic proposals made on June 1, 2009, are proper for consideration. [PPG's] proposals made on June 2 and 3, 2009 are discretionary items for bargaining.

*See* d/e 20-4, p.12. The non-economic proposals are not at issue in this case, nor is the two-tiered system.

The arbitrator issued his Opinion and Award on November 8, 2009, and PPG issued a thirty-day notice to terminate the extension of the Agreement. By letter dated December 9, 2009, PPG sent the following letter to the Union:

> We have met more than 20 times over a period of six months and yet remain deadlocked over the Company's proposal for a $9.45 per hour total labor cost reduction. As I have made clear on multiple occasions in negotiations, this is a critical issue for the Company. The Union has made no proposals including wage reductions for current employees and has expressed unwillingness to consider such reductions, despite the Company's consistent position that they are necessary to

_____

wages for recalled employees and new hires." *See* d/e 20-4, p.5 and n.5.

4

achieve the $9.45 per hour reduction that would bring our labor costs in line with those of our major competitors. The Union has not offered any alternative wage and benefit package that would meet the Company's objectives.

Consequently, please be advised that the Company has concluded that the parties are at an impasse and that we intend to implement the terms of our final offer,[6] beginning Monday, December 14, 2009 at 12:01 a.m.

The Union alleges that PPG has refused to abide by the Award by implementing through its Final Offer the proposals that were ruled untimely by the arbitrator.

## ANALYSIS

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

"Judicial review of arbitration awards is extremely limited, and the merits of the arbitrator's decision will not be reviewed." *Prate Installations, Inc. v. Chicago Regional Council of Carpenters*, 607 F.3d 467, 470 (7th Cir. 2003) (citations omitted). In an action to enforce an arbitration award, the court must enforce the award even if it is improvident or silly. *Prate*, 607 F.3d at 470. "The arbitrator . . . is behind the driver's wheel of interpretation, not the court. Great deference is paid to an arbitrator's construction and interpretation of an agreement." *Dexter Axle Co. v. International Ass'n of Machinists & Aerospace Workers, Dist. 90, Lodge 1315*, 418 F.3d 762, 768 (7th Cir. 2005). In fact, "[w]ith few exceptions, as long as the arbitrator does not exceed this delegated authority, [the] award will be enforced." *Butler Mfg. Co. v. United Steelworkers of America, AFL-CIO-CLC*, 336 F.3d 629, 632 (7th Cir. 2003).

"Using whatever materials are available, the court must enforce the arbitral award '[s]o long as the [arbitrator's] interpretation can in some rational manner be derived from the agreement, viewed in the light of its language, its context, and other indicia of the parties' intention.'" *Butler Mfg.*, 336 F.3d at 636. In this case, the arbitrator did not exceed his delegated authority and rationally derived his opinion from the Agreement.

"If an arbitration award is unclear, it should be sent back to the arbitrator for

---

[6] Hereinafter referred to as the "Final Offer." *See* d/e 20-15, p.2.

5

clarification." *Tri-State Business Machines, Inc. v. Lanier Worldwide, Inc.*, 221 F.3d 1015, 1017 (7th Cir. 2000). However, "a court is permitted to interpret an ambiguous award if the ambiguity can be resolved from the record." *Tri-State Business Machines*, 221 F.3d at 1017. The Union and PPG contend that the award is not ambiguous and that it supports their contrary positions regarding the terms of the Final Offer. The parties do not disagree about the first two sentences of the award. Their disagreement pertains to the third sentence: "[PPG's] proposals made on June 2 and 3, 2009 are *discretionary items for bargaining*." (Emphasis added.) Some of those discretionary items made their way into the Final Offer; the Union claims this violates the Award.

The Union argues that because *specific* economic proposals affecting active employees were not presented until June 2 and 3, *all* economic concessions affecting active employees are discretionary matters for bargaining which may not be imposed unilaterally. PPG's position is that the Union was required to bargain to achieve the $10 reduction, and it was clear before the end of the first bargaining day that achievement of the $10 goal required some economic concessions from active employees.

The court need not determine whether the Award is ambiguous. If it is, the court resolves the ambiguity by looking to the record. *Tri-State Business Machines*, 221 F.3d at 1017. If it is not ambiguous, the court may use whatever materials are available to enforce the Award consistent with the arbitrator's interpretation. *Butler Mfg.*, 336 F.3d at 636. In this case, the matter is resolved by looking to the arbitrator's Opinion.

The Opinion states that "the Union knew or should have know[n] some of the Company's economic proposals." More specifically, the Union knew or should have known prior to June 1 that the company could not meet the $10 target through the two-tiered system alone. The last sentence of the Award must be viewed in the context of the arbitrator's Opinion. The arbitrator makes clear in both the Opinion and Award that the $10 target is valid, as is the two-tiered system. The Union was aware that "the Fresno arrangement would not be enough," and was also aware, from meeting with PPG on May 14 and receiving its email on May 28, that economic concessions would be needed. The arbitrator noted,

> [T]he parties' contract is silent regarding the specificity of proposals and the Union's own behavior indicates that it has not always been precise while proposing contract modifications. In addition, the parties' agreement does not specify that proposals be in writing. Obviously, it is desirable that proposals be as specific as possible and in writing. However, the arbitrator is forbidden from writing into the agreement that which does not exist.

*See* d/e 20-4, pp. 10-11.

Any shortfall in achieving the target from the two-tiered system alone would necessarily require economic concessions from active employees if the $10 reduction was to be reached. This was no surprise to the Union. *One* way to achieve the shortfall would be to implement

6

A-006

some of the June 2 and 3 proposals, but perhaps it was not the *only* way. The Union could come to accept the June 2 and 3 proposals as the least painful way to reach the $10 goal. Hence, the arbitrator found the June 2 and 3 proposals to be discretionary items for bargaining.

Finally, the Award does not even mention what could be implemented unilaterally if an impasse was reached. The court notes that PPG's Final Offer includes a wage reduction and other economic concessions for active employees, but they are not exactly the same wage/economic concessions proposed on June 2 and 3. Moreover, the Final Offer falls short of the $10 reduction; it was expected to reduce the cost per labor hour by only $9.45.

<u>CONCLUSION</u>

For the foregoing reasons, the court grants PPG's motion for summary judgment [21], and denies the Union's summary judgment motion [20]. This case is terminated. The parties shall bear their own costs.

Entered this 27th day of September, 2012.

\s\**Harold A. Baker**

HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE

7

A-007

E-FILED
Thursday, 27 September, 2012 04:09:08 PM
Clerk, U.S. District Court, ILCD

Judgment in a Civil Case (02/11)

# UNITED STATES DISTRICT COURT

for the

Central District of Illinois

| | |
|---|---|
| UNITED STEEL PAPER AND FORESTRY RUBBER MANUFACTURING ENERGY ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION AFL-CIO-CLC LOCAL UNION 193-G ) ) ) ) ) ) ) ) | |
| vs. ) ) | Case Number: **09-2306** |
| PPG INDUSTRIES INC. ) ) | |

## JUDGMENT IN A CIVIL CASE

**DECISION BY THE COURT.**  This action came before the Court.  The issues have been heard and a decision has been rendered.

**IT IS ORDERED AND ADJUDGED** that judgment is entered in favor of the Defendant and against the Plaintiffs. The parties shall bear their own costs.

**Dated:**  September 27, 2012

s/ Pamela E. Robinson
Pamela E. Robinson
Clerk, U.S. District Court

A-008

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STEEL, PAPER AND FORESTRY, | ) | |
| RUBBER, MANUFACTURING, ENERGY, | ) | |
| ALLIED INDUSTRIAL AND SERVICE | ) | 09-2306 |
| WORKERS INTERNATIONAL UNION, | ) | |
| AFL-CIO, CLC, and LOCAL UNION 193-G, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PPG INDUSTRIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

ORDER ON MOTION FOR RECONSIDERATION

The plaintiffs (collectively, the Union) filed a complaint to enforce an arbitration award arising from a June 2009 contract negotiation conference. The Union alleges that the company, PPG Industries, Inc., imposed unilaterally certain wage concessions presented on the second and third days of bargaining, in violation of the arbitrator's award that proposals made on the second and third days were discretionary items for bargaining.

The parties filed cross-motions for summary judgment. The court granted PPG's motion and denied the Union's motion. The Union has filed a motion to alter or amend judgment, arguing that the court altered the meaning of the opinion and award.

A motion to alter or amend judgment under Rule 59(e) should be granted if the movant "clearly establish[es]" that there is newly discovered evidence or there was a manifest error of law or fact. *Harrington v. City of Chicago*, 433 F.3d 542, 546 (7th Cir. 2006). "Reconsideration is not an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996). There is no newly discovered evidence presented; consequently, the Union appears to argue that the court erred either as to the facts or the law – in other words, that the court got the facts wrong, or applied the wrong law to the facts.

The basis for the Union's motion is not the court's error of law or fact, but what amounts, in its view, to an error of reasoning. First, the Union argues that the arbitrator's opinion defines a "discretionary" item for bargaining as one that "may not be permitted unless expressly agreed to in writing," citing the arbitrator's opinion, page 10 [d/e 20-4, p. 11]. But the arbitrator also ended the very same paragraph by stating, "Those proposals introduced on June 2nd and June 3rd

1

are discretionary items which the Union is free to bargain over or not." It can just as easily be said that the arbitrator defined a "discretionary" item for bargaining as one that "the Union is free to bargain over or not." The $10-per-hour reduction in costs was a valid item for bargaining; the Union knew prior to the first day of the conference that the $10 goal could not be met through use of the two-tiered system alone, and concessions from active employees would be required. To give effect to both statements in that paragraph, the only reasonable interpretation is that the Union was required to bargain to reach the $10 goal. It was not required to bargain over the *specific* proposals introduced after the first day, but it could decide to bargain those items to reach the $10 goal.

The Union also argues that the court has found all PPG proposals timely by going beyond the arbitration award. "If an arbitration award is unclear, it should be sent back to the arbitrator for clarification." *Tri-State Bus. Mach., Inc. v. Lanier Worldwide, Inc.*, 221 F.3d 1015, 1017 (7th Cir. 2000). However, "a court is permitted to interpret . . . an ambiguous award if the ambiguity can be resolved from the record." *Tri-State Bus. Mach.*, 221 F.3d at 1017.

On reconsideration, the Union claims that the court elaborated in a way that is contrary to what the arbitrator's opinion said. The arbitrator wrote,

> The Union knew or should have know[n] some of the company's economic proposals – specifically the Employer's labor cost goals as well as the two-tier wage structure.

The court wrote,

> "The Union knew or should have know[n] some of the Company's economic proposals." More specifically, the Union knew or should have known prior to June 1 that the company could not meet the $10 target through the two-tiered system alone.

In other words, the arbitrator found that the Union knew of the $10 goal and the two-tiered system, but the court further found that the Union knew that the company could not meet the $10 target through the two-tiered system alone. Exhibits submitted to both the arbitrator and the court show that the Union did know this, if not prior to June 1, then certainly no later than June 1. A May 28 email from PPG indicates that if more Tier 1 employees left the company, it would be the "best scenario" but that it would be difficult to get to the $10 goal "without significant concessions from current employees."[1] *See* d/e 20-8, p. 2. Moreover, the Union knew no later

---

[1] In its reply brief, the Union points out that the phrase "will be difficult to get to without significant concessions from current employees" differs from PPG's interpretation that the email stated significant wage concessions from current employees "would be needed." But the May 28 email must be viewed in context with prior events. The arbitrator noted that at a May 14 meeting, the Union representative asked if PPG could reach the $10 goal without requiring wage concessions from current employees. PPG responded at the May 14 meeting that the company

2

than June 1, through PPG's opening remarks at the first day of the bargaining session, that "the more people that [PPG] can hire at second tier rates, the better it will be but *it will still be impossible to get to [the $10 goal] without wage adjustments from current employees.*" *See* d/e 22-4, pp. 47-49 (emphasis added).

Finally, the Union continues to believe that the arbitrator's award was not ambiguous. But now that the court ruled against it, the Union asks the court to resolve any ambiguity in its favor based on the record, or to vacate the order granting PPG's summary judgment motion and remand the case to the arbitrator. For the reasons stated above, the court has reviewed the record and finds no reason to alter judgment. Moreover, the Union had not sought to remand until it filed this motion for reconsideration. "A party may not litigate a controversy to completion and then challenge the forum . . . only after he has received an unfavorable final judgment." *United States v. Resnick*, 594 F.3d 562, 569 (7th Cir. 2010) (noting that Rule 59 is not "a vehicle for a party to undo its own procedural failures").

<u>CONCLUSION</u>

The motion for reconsideration [40] is denied.

Entered this 5th day of June, 2013.

/s/Harold A. Baker

_____

HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE

_____

was indifferent as to the means to achieve the $10 reduction, but the Fresno pattern – the two-tiered system – "would not be enough to attain the $10 goal." In response to the Union's request for further information, PPG sent the May 28 email. *See* d/e 20-4, p. 5.

A-011

a plant injury outside the employee's regular working hours, the employee will be paid at their regular rate of pay, for the additional time spent, for up to a maximum of eight (8) additional hours.

**Section 5.** Effective the first Monday following ratification increase the safety shoe allowance from $150 to $160. Effective one year from the first Monday following ratification, increase the safety shoe allowance from $160 to $170.

## ARTICLE XXXI
## BULLETIN BOARDS

**Section 1.** The Company will put up bulletin boards for the posting of notices pertaining to the Union and its members wherever the Company bulletin boards are inadequate or insufficient for the purpose. All notices are to be submitted to the plant manager, or someone designated by him, for approval before being posted. The management will not delay in passing judgment on notices.

## ARTICLE XXXII
## GROUP BENEFITS PLAN BOOKLET
## & PENSION PLAN

**Section 1.** The parties have agreed to a Group Benefits Plan Booklet, a copy of which has been given to the Union and which is incorporated by reference as a part of this Agreement.

**Section 2.** The parties have agreed to a Pension Plan, a copy of which has been given to the Union and which is incorporated by reference as a part of this Agreement.

## ARTICLE XXXIII
## SAVING PROVISION

**Section 1.** If any term or provision of this agreement is, at any time during the life of this agreement, in conflict with any applicable valid Federal or State law, such term or provision shall continue in effect only to the extent permitted by such law. If, at any time thereafter, such term or provision is no longer in conflict with any Federal or State law, such term or provision, as originally embodied in this agreement, shall be restored in full force and effect. If any term or provision of this agreement is or becomes invalid or unenforceable, such invalidity or unenforceability shall not affect or impair any other terms or provision of this agreement.

**Section 2.** The Company and the Union recognize the moral principles involved in the areas of civil rights and have reaffirmed in this Agreement their commitment not to discriminate because of race, color, sex, creed, or national origin; or by reason of age in violation of the Age Discrimination in Employment Act; or by reason of handicap in violation of the Rehabilitation Act of 1973, or the Americans with Disabilities Act of 1990 or by reason of veteran's status in violation of the Vietnam Era Veterans Re-adjustment Assistance Act of 1974. Unless the context clearly provides to the contrary, as used herein, the male gender shall include the female gender, and the female gender shall include the male gender.

## ARTICLE XXXIV
## DURATION OF AGREEMENT

**Section 1.** This Agreement, as amended June 15, 2002, shall continue in full force and effect until 12:00 Noon on June 15, 2008, and from year to year thereafter, unless terminated as hereinafter provided. Notwithstanding the foregoing, Article IX, Section 7, will remain in full force and effect in accordance with its terms.

**Section 2.** Should either party desire to discontinue or modify the existing agreement upon any termination date, at least thirty (30) days prior written notice of such intent must be given to the other party hereto. In the event of notice of cancellation or modification of the agreements, it shall be the duty of the parties to meet in conference not less than (10) days prior to the expiration date of said agreement for the purpose of negotiating new or modified agreements.

It is further agreed that proposed changes or new agreements shall be presented not later than the first day of the conference by the party serving notice.

**Section 3.** This agreement constitutes a complete understanding of the parties on all questions of wages, hours and other terms or conditions of employment, and each party to this agreement hereby expressly waives any right to insist that the other party bargain collectively during the life of this agreement with respect to any economic or non-economic demands, including any demands concerning pensions for employees, or with respect to any question of wages, hours or other terms or conditions of employment, provided, however, that nothing, in this section shall relieve either party of the obligation to participate in the processing of grievances concerning the meaning or application of the provisions of this agreement pursuant to Article VIII hereof, or from the obligations of Article IX of this agreement.

1

---------------------------------------------------

In the Matter of the Arbitration between

**PPG Industries, Mt. Zion, Illinois**

and

**United Steelworkers of America,
Local 193-G**

FMCS 09-58717

Article XXXIV, Section 2
Grievance

**Opinion
and
Award**

---------------------------------------------------

The hearing in this case was held on October 14, 2009, at the Hawthorne Suites Hotel, Decatur, Illinois, before Donald J. Petersen, serving as sole arbitrator. The arbitrator was mutually selected by the parties and appointed by the Federal Mediation and Conciliation Service. Presentation for the Union was made by Stephen H. Yokich, attorney, Cornfield and Feldman. The Company presentation was made by Terrence H. Murphy, attorney, Buchanan, Ingersoll and Rooney.

At the hearing the parties were permitted to present such evidence and argument as they desired including examination and cross-examination of witnesses. Witnesses were:

**Union:**

Mike Mezo

**Company:**

Tom Mordowanec
Joseph O'Malley

No transcript of the hearing was taken but both parties elected to file post hearing briefs.

**The Issue:**

The stipulated issue in this case was: "Did the Company violate Article XXXIV, Section 2? If so, what should be the remedy?"

**Relevant Contract Provisions:**

Article IX, Section 3.  "The Arbitrator shall decide the grievance in writing, and deliver a copy or copies to each party within twenty-five (25) days from the date of his appointment, unless the parties agree to extend this time.

The Arbitrator shall not change or modify this agreement, or have any authority in the making of a new agreement.  He shall have authority to arbitrate only such wage rates as involve change in method or new operations or new or changed jobs arising during the period of this agreement.

Each party may appoint a representative who shall be entitled to sit with the Arbitrator during the hearing and during the consideration of the decision but whose representatives shall not vote on the decision."

Article XXXIV, Section 2.  "Should either party desire to discontinue or modify the existing agreement upon any termination date, at least thirty (30) days prior written notice of such intent must be given to the other party hereto.  In the event of notice of cancellation or modification of the agreements, it shall be the duty of the parties to meet in conference not less than (10) days prior to the expiration date of said agreement for the purpose of negotiating new or modified agreements.

It is further agreed that proposed changes or new agreements shall be presented not later than the first day of the conference by the party serving notice."

**Background:**

PPG Industries ["Company," "Employer" or "PPG" hereinafter] maintains various manufacturing facilities which are dispersed geographically across the United States.  The PPG plant at issue in this case is located in Mt. Zion, Illinois and manufactures performance glazing [flat glass] used for various applications in the construction and refurbishing of residential and commercial buildings.  There are approximately 195 bargaining unit members [active and laid off] at this plant represented by the United Steelworkers of America, Local 193-G ["Union" hereinafter].  Representation at the Mt. Zion facility has existed since 1959.[1]

The parties were signatories to a collective bargaining agreement effective June 15, 2002 and ending June 15, 2008 (Joint Ex. 1).  Subsequently, the parties agreed to extend this contract for an additional year with minor amendments (Joint Ex. 2).

---

[1]The United Steelworkers of America has represented the bargaining unit workers since 1999.  Prior to that time they were represented by the Aluminum, Brick and Glass Workers Union.  The Steelworkers also represent workers at a sister plant located in Fresno, California.

3

Thereafter, on July 1, 2009, the parties agreed to indefinitely extend the terms of the prior agreement with either party having the right to terminate the contract extension by giving a 30 day written notice to the other party (Joint Ex. 3).

Faced with labor costs $10 an hour over its major competitors in the flat glass market, the Company wished to modify the collective bargaining extension and engage in concessionary bargaining. Accordingly, Judy Lewkoski, the Director of Human Resources at the Mt. Zion plant, authored a letter, dated April 22, 2009, addressed to Jeff Wallace, the president of the Local. In that letter it was stated that the Company intended to open negotiations for the existing labor agreement which was to expired on June 15, 2009 (Union Ex. 1). It was suggested in the letter that the parties begin negotiations on June 1, 2009, at the Decatur [Illinois] Convention Center (Union Ex. 1).[2]

At approximately the same time as the letter (Union Ex. 1) was sent, Tom Mordowanec [Corporate Director of Labor Relations] telephoned Mike Mezo [Staff Representative for the Union] requesting a meeting at Chicago's O'Hare Airport. Mr. Mezo agreed and the meeting took place on May 14, 2009. Beside Tom Mordowanec, Mr. Hanley and Mr. Baird were also present for the Company. Mike Mezo was the sole Union representative. Mr. Mordowanec's stated purpose for the meeting was to update Mr. Mezo regarding the economic state of the Mt. Zion plant. He explained that additional manufacturers had entered the flat glass market and had automated equipment. An SAI study was shown to Mr. Mezo where two competitors, Cardinal and Guardian, had labor costs of $22 and $26 respectively, while workers at the Mt. Zion plant carried labor costs of $37. Mr. Mordowanec explained that labor costs had to be brought below $27 if the Mt. Zion plant was to remain viable. He also referenced the October, 2008 negotiations concluded at PPG's sister plant in Fresno, California where a two-tiered wage system had been introduced.[3] Mr. Mordowanec indicated that the Company intended to introduce at the upcoming negotiations the two-tiered wage system. General maintenance workers were to receive an increase to correspond to the area's prevailing wage patterns. Mr. Mordowanec stated that he hoped to buyout some current employees and that new hires would be placed on the second [lower] tier of the two-tier

---

[2]A contract modification procedure is established by Article XXXIV, Section 2 of the parties' collective agreement. That Section reads as follows: "Should either party desire to discontinue or modify the existing agreement upon any termination date, at least thirty (30) days prior written notice of such intent must be given to the other party hereto. In the event of notice of cancellation or modification of the agreements, it shall be the duty of the parties to meet in conference not less than (10) days prior to the expiration date of said agreement for the purpose of negotiating new or modified agreements. It is further agreed that proposed changes or new agreements shall be presented not later than the first day of the conference by the party serving notice."

[3]The Fresno negotiations had become historically a pattern for the Mt. Zion plant to follow. Local Union and Company representatives attended these negotiations.

A-015

4

system.[4]

Mr. Mezo inquired if the Company could reach the $27 labor cost without requiring wage concessions from current employees. Mr. Mordowanec replied that he was indifferent as to the means to achieve the Company objective. He, however, indicated that the Fresno pattern would not be enough to attain the Company's cost goals.

At the meeting, Mr. Mezo requested that the Fresno settlement be given to him and that the Company provide "blended" labor costs for the proposed tow-tiered wage system.

Subsequently, Mr. Mordowanec sent Mr. Mezo the information that he had requested (Company Ex. 1).

Negotiations between the parties began on June 1, 2009, at the Decatur Conference Hall. Tom Mordowanec was the chief spokesman for the Company. The Union's chief negotiator was Mike Mezo. He was assisted by Kevin Smith a Union Staff Representative, and the rest of the local bargaining committee. Mr. Mordowanec made an opening statement in which he stressed the flat glass market was depressed; that the Company's competitive advantages had eroded, and that the Company needed to get labor costs down to $27. He also stressed the need for the Company to obtain a two-tier wage system.[5]

Thereafter, Mr. Mordowanec announced that he was prepared to present "non-economic" proposals. Those proposals (Union Ex. 5) also indicated a reference to a revised two-tier wage system and overtime. The explanation of the proposals consumed the bulk of the day and the session effectively ended at 4:00 p.m. At that point, Mr. Mordowanec indicated that he may have one more non-economic proposal. When asked what time the proposal would be ready, Mr. Mordowanec replied that he could be ready at approximately 4:30 p.m. The Union did not wait to hear the proposal. There were no Union bargaining proposals made on June 1, 2009.

On June 2nd, during the morning bargaining session, Mr. Mordowanec responded to additional questions regarding his "non-economic" proposals from the day before. After the question-answer period had ended, Mr. Mezo stated that the Union was willing to agree to the "non-economic" proposals on a three-year basis. He also indicated that pursuant to Article XXIV, Section 2,[6] the Union was not obligated to bargain regarding proposals which followed the first day of bargaining [i.e., June 1, 2009]. Mr.

_____

[4]Recalled employees would also be placed on the second tier.

[5]Such a system contemplates tier one as the higher wages for current employees and tier two, the lower wages for recalled employees and new hires.

[6]Article XXXIV, Section 2, is cited in full at f.n. 2.

Mordowanec responded that he believed that the Union's position would impede negotiations and that the Company had complied with the procedures outlined in Article XXXIV, Section 2.[7] He pointed to the May 14th Chicago meeting in which the Company outlined its bargaining goals and the May 28th e-mail containing proposed labor costs for a two-tiered system. In addition, Mr. Mordowanec stated that he thought the intent of Article XXXIV, Section 2 was designed to avoid late proposals and last minute surprises. He did not believe the Union was surprised under the circumstances.

Mr. Mezo responded that the Company was being overly legalistic and that it was obliged to bargain with the Union, not dictate the terms of the successor agreement. Moreover, he indicated that after June 1st, the Union would bargain "provisionally."[8]  The Union made no proposals on June 2nd.

On June 3rd, Mr. Mordowanec established dollar amounts corresponding to the two-tiered wage structure. The Company also responded to the Union's letter of the day before, stating in part that:

> "The Company disagrees with the Union's position. We believe that the Company has complied with Article XXXIV.   We expect the Union to bargain over all Company proposals" (Union Ex. 7)."

At some point, an undated grievance was filed by the Union (Joint Ex. 4).  The Union based its claim on an alleged violation of Article XXXIV as that provision requires any proposed contract modifications by the party giving notice [the Company in this case] be made on the first day of negotiations. However, the Company made additional proposals on June 2nd and June 3rd. According to the Union, they were not valid contract proposals (Joint Ex. 4).

The Company filed unfair labor practice charges [8 (b)(5)] against the Union claiming that it had failed to bargain in good faith, on July 10, 2009 (Company Ex. 4).  A hearing was held on September 30, 2009 at the NLRB offices in Peoria, Illinois.  A complaint was issued.  In its answer, the Union maintained that the Company had failed to exhaust its contractual remedies and that the charge and complaint should be deferred to arbitration.

---

[7]During the parties 2002 negotiations, the Union wanted to remove the last two sentences of Article XXXIV, Section 2, which are at issue in the instant arbitration (Union Ex. 15).  Also, during the 2008 negotiations, the Union stated that it desired a "substantial increase" [in wages] (Union Ex. 16).

[8]Such bargaining means, of course, that the Union was not obliged to bargain regarding any issues raised after June 1st unless it desired to do so.  See Union letter dated June 2, 2009 (Union Ex. 6).

Following the June 3rd meeting, the Company and Union have met to bargain on 19 occasions.  On June 17, 2009, the Union made its first economic proposal (Company Ex. 3).  At the top of the page of the Union's written proposal were the words:

> "Union Principles for a counter proposal, PPG Mt. Zion negotiations[.] These principles are presented provisionally and without prejudice to the Union's position that it is not required under the terms of the CBA to negotiate over Company proposals made after June 1, 2009.  They are presented solely in an attempt to explore possible basis [sic] for reaching agreement" (Company Ex. 3).

All subsequent Union proposals contained the wording described above.  The most recent dates of negotiation by the parties were in the first week of September, during which time the Union made additional economic proposals.

No resolution of the grievance proved possible and the parties appealed the matter to the instant arbitration.

**Position of the Union:**

The Union argues that Article XXXIV, Section 2, of the parties' agreement is clear and unambiguous.  Thus, the arbitrator should enforce the contract as written even though it may appear to him as "too strict."  Otherwise, he amends the agreement and acts without authority.  According to the Union, the provision in question mandates that a party serving notice of its desire to modify the contract must provide the other side with its specific proposed modifications to the contract by the end of the first day of formal bargaining.  It was the Company that relied on Article XXXIV when it suggested that the parties should meet in conference on June 1, 2009.

It was further urged by the Union that the term "proposed changes" unambiguously refers to specific proposed modifications to the contract.  A proposed change means an offer by one person to another of terms and conditions with respect to some work or undertaking and the acceptance thereof will make a contract between them.  The wording of Article XXXIV, Section 2 clearly requires the party serving notice of its desire to modify or terminate the agreement "shall present" its proposed changes. The word "shall" is a mandatory one and does not give the moving party in negotiations leave to delay the presentation of its proposals.  The Company presented its non-economic proposals on June 1, 2009–specific proposals regarding non-economic subjects.

However, the Company failed to present the Union with any specific proposed changes to the contract until the second and third days of bargaining.  The overview of thoughts regarding negotiations during the brief May 14, 2009 preliminary meeting and Mr. Mordowanec's opening statement on June 1st were not sufficiently specific or sufficiently tied to the language of the agreement.

2. Even if the arbitrator would accept the Company's version of the facts, most of its

7

bargaining proposals were still untimely. Although Mordowanec told Mezo at the May 14th meeting that the Company would be seeking a $10 per hour reduction in labor costs by the end of the contract, he did not propose any specific changes to the contract that would allow the Company to meet this goal. Moreover, he failed to propose any changes such as vacations, holidays and health care. Thus, if May 14th, not June 1st, is considered the first day of bargaining, every topic other than wages, was untimely and thus, invalid.

3. The Union cited various arbitration and court decisions where truancy of proposals were strictly applied under very similar contract provision in question in this case, even though the result was the untimely party forfeited its right to pursue its bargaining proposals.

4. It was further argued by the Union that there is no basis to amend the contract, based on the parties' past practices. Past practice is not necessary for interpreting purposes because the parties' written understanding is the best evidence of their intentions. The mere fact that the parties have not consistently complied or enforced compliance with a particular provision is not sufficient to work a constructive amendment to the provision. Strong proof of a mutual agreement is needed.

Even if the arbitrator was to consider past practice, the Union complied with the timing of proposals provision in both the 2002 and 2008 negotiations, presenting all of its written proposals on the first day of bargaining.

5. The remedy sought lies well within the arbitrator's authority and also creates no conflict with the National Labor Relations Act as the Union bargained in good faith within the meaning of Section 8(a)(5) of the Act while taking the position in arbitration that it is not obliged to bargain regarding those issues.

**Position of the Company:**

1. The Company argues that the unmistakable intent of Article XXXIV, Section 2, is to preclude late introduction of new bargaining topics. It points out that the language in question requires the party wishing to amend the agreement to provide 30 days notice to the other side and directs that the parties "shall...meet in conference" at least ten days before the contract's expiration in order to negotiate changes or a new agreement. According to the Company, the Union's grievance focuses on the next sentence which states that the party giving notice shall present "proposed changes or new agreements...not later than the first day of conference." The Company asserts that these words do not require that proposed changes or new agreements either be in writing or be presented with a particularly level of specificity. It maintains the word "conference" to mean formal table bargaining. As the language refers to presently proposed changes or agreements "not later than the first day of conference," it clearly contemplates that presentation may be made before the first day of conference.

A-019

8

Article XXXIV, Section 2, has been in the parties' agreement since 1959 and has never been the subject of a grievance or even a proposed contract change.

According to the Company, Mr. Mordowanec, on May 14, informed Mezo that he was proposing to reduce its labor costs from $37 to $27 per hour. He also stated that it would take a two-tier wage system that would apply to new hires and recalled employees to help achieve those cost goals, not to mention wage concessions. Thus, the Union could not say that it was surprised regarding the Company proposals.

2. The Company also argues that the parties' past practices do not support the Union's position that written, specific proposals must be made prior to June 1st. However, the Union's wage proposals in 2002 were for a "substantial [wage] increase." which is not specific. Moreover, its initial proposals were presented less than 10 days prior to the contract's expiration. Indeed, in its 2008 proposals, the Union even included the right to "make new or additional proposals."

3. According to the Company, the grievance was manufactured to avoid bargaining over concessionary proposals which the Union deemed too harsh. The Union's chief negotiator admitted as much when he said that the Union's approach was a "tactic, not a strategy." The Union was aware the first day of bargaining what the Company proposals would be, except for specific wage rates.

4. The Company further contends that the arbitrator may not invalidate its proposals made after June 1, 2009. First, the Company claims that there is nothing in Article XXXIV, Section 2, which indicates that proposals made after the first day of conference are invalid. There is no history of the parties declaring proposals invalid based on the timing of their presentation. The parties, on the contrary, have flexibly applied the language in question over many years.

Secondly, Article IX, Section 3, includes both a typical limitation on the arbitrator's authority to "change or modify" the agreement but also that he or she shall have no "authority in the making of a new agreement." According to the Company, the Union is here asking the arbitrator to invalidate Company proposals including economic concessions.

Third, the Union is asking the arbitrator to effect a bargaining waiver by the Company. In essence, bargaining could only take place when and if acceptable to the Union. Creating a forfeiture of bargaining rights invades the province of the National Labor Relations Board.

Finally, when all of the Company's proposals were presented in specific, written terms, more than ten days before the expiration of the agreement, the Union suffered no harm or damage, which makes the requested remedy both extra contractual as well as punitive. Moreover, a contract interpretation that would result in a party's waiver or forfeiture of important rights is not favored and is to be avoided.

Case: 1:13-cv-02306 HAB-DGB  Document # 22-3    Filed: 09/26/2013    Pages: 25

9

**Opinion:**

The nub of this case involves the interpretation and/or application of Article XXXIV, Section 2, of the parties' agreement.  This language reads:

> "Should either party desire to discontinue or modify the existing agreement upon any termination date, at least thirty (30) days prior written notice of such intent must be given to the other party hereto.  In the event of notice of cancellation or modification of the agreements, it shall be the duty of the parties to meet in conference not less than (10) days prior to the expiration date of said agreement for the purpose of negotiating new or modified agreements.
>
> It is further agreed the proposed changes or new agreements shall be presented not later than the first day of the conference by the party serving notice."

The Company exercised its right under Article XXXIV, Section 2, to modify the parties' collective bargaining agreement on April 22, 2009.  It suggest that "negotiations" be held on June 1, 2009.[9]  This portion of the Article and Section in question was not in dispute in this case.

However, the Union contends that Article XXXIV, Section 2, specifically requires that proposed changes or new agreement "...shall be presented not later than the first day of the conference by the party serving notice."  The word "shall" is mandatory, not permissive.  Proposals made after the first day of the conference are invalid.  Nevertheless, while June 1, 2009 was the first day of conference, the language in question indicates that proposed changes shall be presented *not later* than the first day of the conference..." [emphasis supplied].  The term "not later" means, of course, that proposals might be submitted prior to the ""first day of conference."  The Union claims that proposals must be specific.  Obviously, it is difficult to negotiate  vague or unclear proposals.[10]   It can be noted for the record that the Union cited the decision in the *Wheelabrator* case [108 LA 1138].  The language in that case does not indicate that only specific proposals must be delivered.  However, in the *City of Roseburg* [97 LA 262] the relevant contract language indicates that "...it desires to modify the certain *specific terms* of the agreement" [emphasis supplied].  Thus, the parties' contract is silent regarding the specificity of proposals and the Union's own behavior indicates that it has not always

---

[9]Pursuant to a prior settlement agreement, the parties' current contract was due to expire on June 15, 2009 (Joint Ex. 2).

[10]Nevertheless, the Union submitted a proposal during the 2008 negotiations asking for a "substantial" wage increase.  While the Company failed to protest this lack of specificity, it nevertheless shows that even the Union did not understand Article XXXIV, Section 2 to necessarily mean that only specific proposals were to be submitted.

been precise while proposing contract modifications. In addition, the parties' agreement does not specify that proposals be in writing. Obviously, it is desirable that proposals be as specific as possible and in writing. However, the arbitrator is forbidden from writing into the agreement that which does not exist.

In the instant case, the Company indicated to the Union on May 14th that it was seeking a $10 reduction to its labor costs. The Fresno agreement was also discussed which contained a two-tier wage structure. Mr. Mordowanec indicated that the Fresno arrangement would not be enough, and that new hired and recalled employees would be placed on the bottom of the two-tiered system.

On May 28, 2009, Mr. Mordowanec, responding to a request from Mike Mezo, sent a chart showing the blending of the two-tiered system came to $30.21.

Therefore, the Union knew or should have know some of the Company's economic proposals–specifically the Employer's labor cost goals as well as the two-tier wage structure. The Company has preserved these proposals on the basis that the language of Article XXXIV, Section 2, permits, as previously discussed, discussion of proposals prior to the first day of conference.

However, proposals made subsequent to the first date of conference may not be permitted unless expressly agreed to in writing. The Company proposed non-economic items on June 1, 2009 (Union Ex. 5). These items plus the target labor costs and the two-tiered system comport with Article XXXIV, Section 2, of the parties' agreement. Those proposals introduced on June 2nd and June 3rd are discretionary items which the Union is free to bargain over or not.

Article XXXIV, Section 2, can be likened to any timeliness provision in a contract. The parties negotiate such language for a reason. Whether that reason is wise or not is not an arbitrator's job to fathom. We exist to enforce the provisions of the collective bargaining agreement as they exist. I would exceed my authority to do otherwise.

I am not impressed with the Company's referral to Article IX, Section 3 of the agreement which states in part that an arbitrator lacks "...any authority in the making of a new agreement." The Company's position is that negating its proposals on June 2nd and 3rd is tantamount to doing that which Article IX, Section 3, forbids. However, I am simply enforcing the explicitly terms of Article XXXIV, Section 2. That is not creating a new agreement, but simply enforcing the one in effect.

Even assuming *arguendo* past practice were somehow relevant in this case, past practice cannot alter clear contract language. That is parol evidence. Moreover, neither party has acted to enforce Article XXIV, Section 2, in the past does not mean that the provision loses its meaning and/or applicability.

Case: 10-2466    Document: 10    Filed: 09/13/2013    Pages: 25

11

**Award:**

The Company's proposal regarding $10 reduction in costs is a viable contract proposal as is the two-tiered system.  Also, the Company's non-economic proposals made on June 1, 2009 are proper for consideration.  The Company proposals made on June 2 and 3, 2009 are discretionary items for bargaining.

November 8, 2009
Placitas, New Mexico


_____
Donald J. Petersen
Arbitrator

A–023

## CIRCUIT RULE 30(d) CERTIFICATE

Pursuant to Circuit Rule 30(d), the undersigned hereby certifies that all lthe materials required by Circuit Rules 30(a) and 30(b) are included in the foregoing **Appendix**.

/s/ Stephen A. Yokich
Stephen A. Yokich

One of the attorneys for Plaintiffs-Appellants

Dated:  September 12, 2013